J-S57036-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| EUGENE REAGAN, | : | |
| | : | |
| Appellant | : | No. 647 EDA 2017 |

Appeal from the Judgment of Sentence October 4, 2016
in the Court of Common Pleas of Delaware County,
Criminal Division, No(s):  CP-23-CR-0005918-2015

BEFORE:  PANELLA, SOLANO and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:              **FILED OCTOBER 18, 2017**

Eugene Reagan ("Reagan") appeals from the judgment of sentence imposed following his conviction of two counts of recklessly endangering another person, and one count each of attempted murder, aggravated assault, and firearms not to be carried without a license.[1]  Additionally, Reagan's counsel, James Brose, Esquire ("Attorney Brose"), has filed a Motion to Withdraw as Appellate Counsel, as well as a brief pursuant to ***Anders v. California***, 386 U.S. 738, 744 (1967) (hereinafter the "***Anders*** Brief").  We grant Attorney Brose's Motion to Withdraw, and affirm Reagan's judgment of sentence.

In its Opinion, the trial court set forth the relevant factual and procedural history, which we adopt for the purpose of this appeal.  ***See*** Trial Court Opinion, 4/6/17, at 1-13.

---

[1] ***See*** 18 Pa.C.S.A. §§ 2705, 901(a), 2501(a), 2702(a)(1), 6106(a)(1).

On July 22, 2016, a jury convicted Reagan of the above-referenced crimes. On October 4, 2016, the trial court sentenced Reagan to an aggregate prison term of 15 to 30 years. Reagan filed a *pro se* Motion to reconsider sentence. The trial court thereafter appointed Attorney Brose as Reagan's counsel. On February 7, 2017, the trial court denied Regan's Motion to reconsider sentence. Reagan filed a timely Notice of Appeal, and a court-ordered Concise Statement of matters complained of on appeal. However, *in lieu* of filing a brief on Reagan's behalf, Attorney Brose filed an *Anders* brief.

"When presented with an *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw." *Commonwealth v. Garang*, 9 A.3d 237, 240 (Pa. Super. 2010) (citation omitted). Pursuant to *Anders*, when counsel believes an appeal is frivolous and wishes to withdraw from representation, he must do the following:

> (1) petition the court for leave to withdraw stating that after making a conscientious examination of the record, counsel has determined the appeal would be frivolous; (2) file a brief referring to any issues that might arguably support the appeal, but which does not resemble a no-merit letter; and (3) furnish a copy of the brief to the defendant and advise him of his right to retain new counsel, proceed *pro se,* or raise any additional points he deems worthy of this Court's attention.

*Commonwealth v. Edwards*, 906 A.2d 1225, 1227 (Pa. Super. 2006) (citation omitted). In *Commonwealth v. Santiago*, 978 A.2d 349 (Pa.

2009), our Supreme Court addressed the second requirement of **Anders**, *i.e.*, the contents of an **Anders** brief, and required that the brief

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, 978 A.2d at 361. "Once counsel has satisfied the [**Anders**] requirements, it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." **Edwards**, 906 A.2d at 1228 (citation omitted).

Here, Attorney Brose has complied with each of the requirements of **Anders**. Attorney Brose indicates that he conscientiously examined the record and determined that an appeal would be frivolous. Further, Attorney Brose's **Anders** brief comports with the requirements set forth in **Santiago**. Finally, the record includes a copy of the letter that Attorney Brose sent to Reagan, advising him of his right to proceed *pro se* or retain alternate counsel and file additional claims, and stating Attorney Brose's intention to seek permission to withdraw. Thus, Attorney Brose has complied with the

procedural requirements for withdrawing from representation. Accordingly, we will conduct an independent review to determine whether Reagan's appeal is, in fact, wholly frivolous.

The first issue raised in the **Anders** brief is whether the trial court erred by granting the Commonwealth's Motion *in limine* to limit testimony regarding prior incidents between Reagan and his ex-wife, Margaret Giles ("Giles"). **Anders** Brief at 3. Attorney Brose points to the trial court's ruling that Reagan could not testify about incidents with Giles that had occurred more than one year prior. **Id**. at 4. Attorney Brose contends that challenging the court's ruling would be useless because Reagan did not claim self-defense; the incidents with Giles were not criminal events; and the victim, Gary Hudson ("Hudson"), was not deceased. **Id**. Attorney Brose also points to Reagan's claim that the gun went off "accidentally," and argues that such claim rendered any prior disputes between him and Giles irrelevant. **Id**. at 5. Finally, Attorney Brose asserts that, even if the trial court erred in limiting the testimony, such error was harmless, as the evidence of Reagan's guilt was overwhelming. **Id**.

In its Opinion, the trial court addressed this issue, set forth the relevant law, and determined that the issue lacked merit. **See** Trial Court Opinion, 4/6/17, at 19-20; **see also id**. at 21 (wherein the trial court determined that even if its ruling was in error, such error was harmless, as the evidence of Reagan's guilt was overwhelming). We agree with the trial

- 4 -

court's determination, and affirm on this basis as to the first issue raised in the *Anders* brief. *See id*.

The second issue raised in the *Anders* brief is whether the trial court erred by denying Reagan's Motion *in limine* to preclude Timothy Bates ("Bates") from providing testimony that differed from his statement to police. *Anders* Brief at 5. According to Attorney Brose, "the only discrepancy in the [trial] testimony of [] Bates versus his prior statement was that he saw [Reagan] approach the car where the shooting occurred after he had walked back to his truck. *Id*. at 6. Attorney Brose points out that Bates consistently stated that he saw Reagan approach the car and shoot into it. *Id*. Finally, Attorney Brose asserts that the defense had the opportunity to cross-examine Bates about the discrepancy, and the jury had the ability to assess his credibility. *Id*.

In its Opinion, the trial court addressed this issue, set forth the relevant law, and determined that the issue lacked merit. *See* Trial Court Opinion, 4/6/17, at 20; *see also id*. at 21 (wherein the trial court determined that even if its ruling was in error, such error was harmless, as the evidence of Reagan's guilt was overwhelming). We agree with the trial court's determination, and affirm on this basis as to the second issue raised in the *Anders* brief. *See id*.

The third issue raised in the *Anders* brief is whether the trial court erred in making its rulings regarding Reagan's expired license to carry a

- 5 -

firearm. ***Anders*** Brief at 6-7. According to Attorney Brose, the trial court initially precluded testimony regarding the expired license, but ultimately permitted Reagan to testify about the license, and allowed the license to be admitted as a defense exhibit. ***Id***. at 7.

In its Opinion, the trial court addressed this issue, set forth the relevant law, and determined that the issue lacked merit. ***See*** Trial Court Opinion, 4/6/17, at 20-21; ***see also id***. at 21 (wherein the trial court determined that even if its ruling was in error, such error was harmless, as the evidence of Reagan's guilt was overwhelming). We agree with the trial court's determination, and affirm on this basis as to the third issue raised in the ***Anders*** brief. ***See id***.

The fourth issue raised in the ***Anders*** brief is whether the trial court erred when it instructed the jury as to "flight as consciousness of guilt." ***Anders*** Brief at 7. Attorney Brose claims that there is no dispute that, after the shooting, Reagan got in his truck and drove away from the crime scene. ***Id***. Attorney Brose further claims that the trial court's instruction was taken directly from the model jury instructions on flight as consciousness of guilt. ***Id***.

In its Opinion, the trial court addressed this issue, set forth the relevant law, and determined that the issue lacked merit. ***See*** Trial Court Opinion, 4/6/17, at 21-24. We agree with the trial court's determination,

and affirm on this basis as to the fourth issue raised in the **Anders** brief. **See id**.

The final issue raised in the **Anders** brief is whether the evidence was sufficient to support Reagan's convictions. **Anders** Brief at 8. According to Attorney Brose, consistent credible testimony from several witnesses, and video evidence from the bar, placed Reagan at the scene of the shooting. **Id**. Attorney Brose indicates that Reagan admitted that he approached the car, but claimed that the gun had gone off "accidentally." **Id**. Attorney Brose asserts that "the only issue for the jury was whether [] Reagan had the intent to fire that gun and injure or kill [] Hudson." **Id**. Attorney Brose contends that the Commonwealth presented the uncontradicted testimony of Detective Louis Gandizio, who testified that the gun in question would not have accidentally fired by banging it on a car window, and would only have discharged by someone pulling the trigger. **Id**. at 8 (citing N.T., 7/21/16, at 286-87). Attorney Brose argues that this evidence, when viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to support the verdict. **Id**. at 9.

In its Opinion, the trial court addressed this issue, set forth the relevant law, and determined that the issue lacked merit. **See** Trial Court Opinion, 4/6/17, at 14-19. We agree with the trial court's determination, and affirm on this basis as to the fourth issue raised in the **Anders** brief. **See id**.

Based on our independent review of the record, we conclude that all of the issues raised in the **Anders** brief are, in fact, wholly frivolous. Having found no other non-frivolous issues during our review, we grant Attorney Brose's Motion to Withdraw, and affirm Reagan's judgment of sentence.

Motion to Withdraw granted; judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/18/2017

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA      :
                                    :
           v.                  : NO. CP-23-CR-0005918-2015
                                      :
EUGENE REAGAN                        :

Michael Mattson, Esquire, for the Commonwealth
James F. Brose, Esquire, for the Defendant

## OPINION

Brennan, J.                                           April 6, 2017

I.     STATEMENT OF FACTS AND PROCEDURAL HISTORY

Eugene Reagan (Defendant) appeals from the judgment of sentence of fifteen to thirty years imprisonment that was imposed after a jury convicted him of Attempted Murder,[1] Aggravated Assault,[2] Recklessly Endangering Another Person,[3] and Firearms Not To Be Carried W/O License.[4]

In addition to the outlined witness testimony which will follow below, the Commonwealth also presented the video security footage (no audio) from the night of the incident. The video depicts several different angles of all of the events that occurred inside Carlette's Hideaway Bar and two angles outside of the building

---

[1] Title 18 Section 901 (A); Title 18 Section 2501 (A).
[2] Title 18 Section 2702 (A)(1).
[3] Two Counts; Title 18 Section 2705.
[4] Title 18 Section 6106 (A) (1).

1

-15-

which shows all but the actual shooting. The jury watched the video over and over and over during both the Commonwealth case and Defense.

The following witness testimony was presented at trial. Gary L. Hudson has known Margaret Giles since 2012. He described their relationship as "friends". On the evening of August 15, 2015, he and Ms. Giles were having drinks at Carlette's Hideaway in Upper Darby Township. That evening was the first time Mr. Hudson had been to Carlette's Hideaway. N.T. 7/20/2016 p. 144. They arrived approximately between 9:30 and 10:00 p.m. While they were sitting at the bar, the Defendant approached Mr. Hudson and introduced himself. N.T. 7/20/2016 p. 148. Through previous conversations with Ms. Giles, Mr. Hudson made the connection that the Defendant was the ex-husband of Ms. Giles. Prior to that evening, Mr. Hudson never met the Defendant before. When the Defendant approached, he asked Ms. Giles "Is this your new boyfriend?" Ms. Giles answered "No, we're just friends." The Defendant then approached Mr. Hudson and asked him the same question. Mr. Hudson gave the same reply as Ms. Giles and answered "No, we're just friends." Defendant's demeanor was calm, but he was very adamant to know what their relationship was. N.T. 7/20/2016 p. 149, 150. Ms. Giles then called over a security guard who told the Defendant he had to go to the other end of the bar if he wanted to stay. N.T. 7/20/2016 p. 151. A short time later Defendant returned

2

-16-

and asked Ms. Giles the same question. "Is this your new boyfriend?" Ms. Giles once again said no. The Defendant then came over to Mr. Hudson and again asked him the same question. Mr. Hudson again answered "No, we're just friends." At that point the Defendant said "Well I just want to let you know, I have a gun." Mr. Hudson asked the Defendant why he would make a statement like that when he told the Defendant they we're just friends. The Defendant responded, "Well, like I said, I just want to let you know I have a gun." At that point, the security guard returned and escorted the Defendant out of the building. Mr. Hudson did not see the Defendant inside Carlette's Hideaway again that night. N.T. 7/20/2016 p. 152. Approximately 60 to 90 minutes later Mr. Hudson and Ms. Giles left Carlette's Hideaway together and went directly to Ms. Giles' car. N.T. 7/20/2016 p. 161. Upon arriving at Ms. Giles' car, Mr. Hudson got in the front passenger seat and shut the door. Ms. Giles got into the driver side and shut her door. Immediately after they closed their doors, Mr. Hudson heard a gentleman say, "motherfucker" and then saw a light flash from the driver's side window and knew he was shot. Mr. Hudson could not see the face of the person who shot him but he heard Ms. Giles say, "oh, my God, he shot him. Gene shot him." At that point he knew it was the Defendant who shot him. N.T. 7/20/2016 p. 163, 164. Mr. Hudson suffered serious life-threatening injuries as a result of the shooting.

3

-17-

Ms. Margaret Giles also testified at trial. Her testimony of the events inside Carlette's Hideaway was similar to Mr. Hudson's testimony. Ms. Giles testified that when they got back to her car, she got in the driver's seat and Mr. Hudson got in the passenger seat. Ms. Giles started the vehicle and looked up. She saw the Defendant was standing at the car. Ms. Giles said to Mr. Hudson, "there's Gene." The next thing she remembers is the Defendant shooting Mr. Hudson. Ms. Giles jumped out of her car and was panicking. She recalls that Mr. Hudson was able to get out the car. At that point, Ms. Giles remembers being surrounded by people from the bar. N.T. 7/20/2016 p. 242. After the shooting, Ms. Giles recalls the Defendant leaving the scene in a red 2015 Chevy Silverado pickup truck. When the police arrived, Ms. Giles told them that her ex-husband, the Defendant, shot Mr. Hudson. N.T. 7/20/2016 p. 245. After the shooting Ms. Giles received a letter from the Defendant. In the letter the Defendant apologized to her for shooting Mr. Hudson. N.T. 7/20/2016 p. 249, 250.

Timothy Bates testified he works security at Carlette's Hideaway. His duties include maintaining a safe environment and to make sure that people get safely to their cars when they are leaving. On the evening of August 15th, 2015, he was working at Carlette's Hideaway as a security guard. N.T. 7/21/2016 p. 35. Mr. Bates knew the Defendant because the Defendant frequented the bar and did snow

4

-18-

plowing for the owner of the bar property. N.T. 7/21/2016 p. 36.

Mr. Bates was at the bar entrance that led to the parking lot. He observed the Defendant come into the bar, order a drink, go down to the other end of the bar. The Defendant was there a few minutes when a patron waved to Bates to come to that end of the bar. When Mr. Bates came to the other end of the bar patrons pointed to the Defendant. Mr. Bates talked to the Defendant and told him that the bar was not the place for any altercation. The Defendant agreed and went back to the opposite end of the bar. A couple minutes later, Mr. Bates left the bar to escort a couple of ladies to their car. When he came back into the bar, the Defendant was back at the other end of the bar confronting Mr. Hudson and Ms. Giles. Mr. Bates then went to the end of the bar where the Defendant was located and asked him to leave. The Defendant agreed and Mr. Bates walked him outside. N.T. 7/21/2016 p. 37, 38. A little after midnight Mr. Bates saw the Defendant's red truck pull up. The Defendant got out of his truck and walked around to another car and fired one gun shot into the car. N.T. 7/21/2016 p. 44. He then watched the Defendant hurry back to his truck. At that point Mr. Bates went back into the bar and got the owner of the bar because he did not think the car was occupied. N.T. 7/21/2016 p. 45. Both Mr. Bates and the owner went over to where the shooting occurred. The Defendant was still there next to his truck. Mr. Bates asked the Defendant "What did you do?" The

5

Defendant said, "I didn't shoot anybody." N.T. 7/21/2016 p. 47.

Mr. Kenneth Brooks testified his wife is the owner of Carlette's Hideaway. He knows the Defendant because the Defendant frequents the bar and did snow plowing for him. N.T. 7/21/2016 p. 120. Mr. Brooks was at Carlette's Hideaway around midnight on the evening of August 15th, 2015. Mr. Brooks had been at a wedding reception earlier that evening. The Defendant was at the same reception but they did not interact. A little after midnight Mr. Bates came into the bar and alerted him there was an incident outside. Mr. Brooks went outside and saw the Defendant's red truck parked underneath the Septa bridge. Mr. Brooks approached the Defendants truck and saw him coming around the back of his truck. Mr. Brooks asked the Defendant "Gene, what are you doing?" The Defendant answered "I just shot that motherfucker." Then the Defendant went back around his truck, got in his truck, and pulled off. N.T. 7/21/2016 p. 125, 126.

Sergeant Shawn Burns is employed by Yeadon Borough as a patrol sergeant. He is a fourteen year veteran of the department. On the night of August 15th and into August 16, 2015, Sergeant Burns was on duty in a full uniform and patrolling in a marked patrol vehicle. At approximately 12:08 a.m., Sergeant Burns received notification by way of police radio of a shooting that just occurred at Carlettes Hideaway. N.T. 7/21/2016 p. 148. About a minute or so after the initial call, further

6

-20-

information was radioed regarding the shooter and whether or not he was still on the scene. Sergeant Burns was informed that the shooter had fled in a red Chevrolet pickup in an unknown direction. About a minute later, Sergeant Burns observed a red Chevrolet pickup truck traveling towards him and away from the direction of Carlette's. N.T. 4/7/2016 p. 19.N.T. 7/21/2016 p. 148. Sergeant Burns proceeded to turn around and activate his overhead lights. The red Chevrolet pickup truck pulled over. The Defendant was the operator of the pickup truck and its only occupant. The Defendant immediately exited the truck and began to walk towards Sergeant Burns' vehicle. Sergeant Burns exited his patrol vehicle as fast as he could and drew his service weapon on the Defendant. Sergeant Burns told the Defendant to stop walking and to put his hands on the red pickup. The Defendant complied with Sergeant Burns order. N.T. 7/21/2016 p. 150 - 152. As Sergeant Burns approached the Defendant, he asked the Defendant, "Do you have a gun on you sir?" The Defendant replied "No, it's in the truck." Sergeant Burns then approached the Defendant, patted him down, and placed him in restraints for officer safety. N.T. 7/21/2016 p. 153, 154.

Officer Steven Tarozzi is employed by Upper Darby Township Police Department as a Patrolman and has been so employed for nine years. He was on patrol the overnight shift from August 15th, 2015, to August 16, 2015. He was in

7

- 2) -

full uniform and in a marked patrol vehicle. At approximately 12:08 a.m., he heard dispatch information from DELCOM regarding a shooting at Carlette's Hideaway. After he cleared a previous call, Officer Tarozzi responded to the area of Defendant's traffic stop. N.T. 7/21/2016 p. 169 - 171. Upon Officer Tarozzi's arrival, the Defendant was inside a police car and handcuffed. Officer Tarozzi participated in conducting a show-up identification procedure with potential witnesses to the shooting at Carlettes. Upper Darby officers transported Ms. Giles and Mr. Bates to that location, where the witnesses, separate from one another, positively identified the Defendant as the shooter. The Defendant was then formally placed under arrest and transported back to Upper Darby Police Department by Officer Tarozzi. While transporting the Defendant, and without being asked, the Defendant blurted out "It was because of a domestic. It's something I'm going to have to deal with now". N.T. 7/21/2016 p. 174 - 176.

At Police Headquarters, Detective Francis George of the Upper Darby Township Police Department read the Defendant his Miranda warnings. The Defendant initialed and signed the Advisement of Rights Form and agreed to speak with police. N.T. 7/21/2016 p. 214 - 217. The Defendant gave both oral and written statements to Detective George. N.T. 7/21/2016 p. 220. In his written statement the Defendant stated, "I walked up to the car and banged on the glass and the gun

8

-22-

accidentally discharged. I walked back to the truck and drove away." N.T. 7/21/2016 p. 224. At the end of his statement Defendant said, "I am very remorseful for what happened tonight. I have been dealing with a lot with the separation from my wife, the financial burdens that I face, and I'm emotionally drained," N.T. 7/21/2016 p. 225. The Defendant then signed an Upper Darby Consent to Search Form and gave Detective George permission to search his Chevrolet pickup truck. N.T. 7/21/2016 p. 226. Detective George obtained the Pennsylvania State Police report that certified the Defendant did not have a valid license to carry firearms issued under the provisions of section 6109 of the Crimes Code, nor did he have a valid sportsman's firearm permit issued under the provisions of section 6106(c) of the Crimes Code. N.T. 7/21/2016 p. 229.

Criminal Investigator Philip Lydon of the Upper Darby Township Police Department located a silver .38 caliber Smith and Wesson revolver with four live rounds and one empty shell casing in the firearm behind the passenger seat of the Defendant's red pick-up truck. N.T. 7/21/2016 p. 190. Paperwork located in the truck indicated the truck was owned by the Defendant. N.T. 7/21/2016 p. 194.

Detective Louis Grandizio is employed by the Delaware County Criminal Investigation Division as a detective and firearms examiner. He was qualified as an expert in the field of firearm and tool mark examination. N.T. 7/21/2016 p. 272. He

9

examined the silver-colored Smith & Wesson .38 caliber revolver with serial number BMA4553 recovered from the Defendant's truck. He performed a draw-impact-discharge test and a drop-safety test on that revolver. N.T. 7/21/2016 p. 279. Neither one of those tests induced the cartridge to discharge, meaning it did not cause the gun to fire a round. N.T. 7/21/2016 p. 280. Detective Grandizio opined that it would not be possible for the revolver to discharge merely by banging it on a glass window. Through his testing and from his examination of the safety mechanisms on the revolver, Detective Grandizio stated it was his opinion that the revolver would only discharge by pulling the trigger. N.T. 7/21/2016 p. 286, 287.

The parties stipulated to the authenticity of Commonwealth's Exhibit C-27 which contained audio recordings of telephone conversations between the Defendant and others. N.T. 7/21/2016 p. 303. Certain parts of these conversations were published to the jury. N.T. 7/21/2016 p. 307 -312. Defendanttold his family members that he just lost it.

The Defendant presented two witnesses who testified he has a good reputation in the community for peacefulness and non-violence. The parties stipulated, that if called, three additional witnesses would testify that the Defendant has a good reputation in the community for peacefulness and non-violence. The Defendant then took the stand in his own defense. His version of what transpired in

10

the bar were the opposite of Ms. Giles and Mr. Hudson's account. He testified he was cordial to both Ms. Giles and Mr. Hudson. The Defendant stated it was Ms. Giles who became agitated because the Defendant was cordially speaking to Mr. Hudson and shaking his hand. N.T. 7/22/2016 p. 24. The Defendant stated he was having problems with Ms. Giles since he divorced her for cheating on him and stealing from him. N.T. 7/22/2016 p. 25, 26. The Defendant testified on one occasion Ms. Giles came to his fiancee's house at 10:30 to 11 at night "making a big scene." N.T. 7/22/2016 p. 28. When the Defendant returned home he saw a cinderblock was through his dining room window. The Defendant reported the incident to the Aldan Police Department. N.T. 7/22/2016 p. 30. The Defendant described another incident in March of 2015, where Ms. Giles came to his place of business, trashed his office, knocked all of his files over, broke his television and broke a picture of his fiancee he had on his desk. N.T. 7/22/2016 p. 33. The Defendant stated there was another incident in February of 2015. He was at a restaurant when Ms. Giles came in with her girlfriends. Ms. Giles threw a drink in his face. He said Ms. Giles was then escorted out of the restaurant. N.T. 7/22/2016 p. 34. The Defendant stated he mentioned the previous incidents because he was concerned that Ms. Giles would create a scene at Carlette's the night of the shooting. He stated Ms. Giles "was getting loud and fat-mouthing off and being

11

-25-

rude." N.T. 7/22/2016 p. 41. At that point the Defendant said the conversation became heated because "I say to Margaret Giles do not make a scene here because you know I do business with them, he [Mr. Hudson] interjected and said to me he's the new sheriff in town." The Defendant testified Mr. Hudson then said to him, I'm going to fuck you up." The Defendant stated he felt that Mr. Hudson was threatening him. N.T. 7/22/2016 p. 42. The Defendant testified that he was scared of both Mr. Hudson and Ms. Giles. N.T. 7/22/2016 p. 46. The Defendant denied that he ever told Mr. Hudson he had a gun. The Defendant admitted he carries a revolver in his truck for self protection. N.T. 7/22/2016 p. 49. The defendant said he had a license to carry a gun most of his adult life. In response to his counsel's question, he stated he was not sure if his license expired in 2012. N.T. 7/22/2016 p. 53.

According to his testimony, the Defendant left Carlette's and changed his clothes in his truck. He then walked to Paradise Pizza and purchased a chicken cheese steak. Approximately 45 minutes later when he was returning to his truck, he saw Mr. Hudson and Ms. Giles exiting Carlette's. N.T. 7/22/2016 p. 64. The Defendant watched them get into Ms. Giles' car. The Defendant's car was parked behind Ms. Giles' car. The Defendant was waiting for them to drive away because he thought maybe they were going to follow him. He wanted them to drive away

12

-26-

first. N.T. 7/22/2016 p. 64. The Defendant waited 10 to 15 minutes for the Giles car to pull out but it didn't leave. The Defendant then pulled out with his head lights turned off. The Defendant then got out of his truck with his gun. The defendant admitted that the revolver recovered from his truck was in fact his gun. N.T. 7/22/2016 p. 69, 70. Relating his version, as the Defendant approached Ms. Giles' car, he had the gun in his hand and his finger was on the trigger. The Defendant stated he armed himself because he alleges that Ms. Giles stole a 9 mm. gun out of his house and he thought she might be armed. N.T. 7/22/2016 p. 71, 72. When the Defendant got to the driver's side of the car, he stated Mr. Hudson and Ms. Giles suddenly sat up and the gun accidentally discharged. The Defendant stated he had no intention to shoot anyone. He was only trying to use the gun to scare Mr. Hudson. At that point, the Defendant panicked and went back to his truck. He denied seeing Mr. Bates or Mr. Brooks after the shooting and denied making statements to them. He stated he was going to call the police but his phone was dead. He decided to drive to the police station but was stopped by Sergeant Burns before he got there. N.T. 7/22/2016 p. 74 - 76, 177 - 180.

II. DISCUSSION

In his 1925(b) statement the Defendant raises the following issues on appeal:

"1. Evidence at trial was insufficient to support guilty finding.

13

-27-

2. The trial court erred by granting the Commonwealth's Motion in Limine to preclude Mr. Reagan from testifying about prior incidents of Ms. Giles' behavior that were older than one year.

3. The trial court erred by denying Mr. Reagan's Motion in Limine to preclude Mr. Bates' testimony from testifying to additional facts which were not included in the statement provided in discovery.

4. The trial court erred by overruling defendant's objection to "flight as consciousness of guilt" jury instruction.

5. The trial court erred by granting the Commonwealth's Motion in Limine to preclude testimony or reference to defendant's expired license to carry a firearm."

The Defendant first challenges the sufficiency of the evidence to convict him of all charges. Initially, it must be noted that in his 1925(b) statement quoted above, the Defendant does not specify which element of each charge the Commonwealth has failed to prove. When an appellant is challenging the sufficiency of the evidence on appeal, their 1925 statement "must specify the element or elements upon which the evidence was insufficient " so as to preserve the issue for appeal. *Commonwealth v. Flores*, 921 A.2d 517, 522-523 (Pa. Super. 2007); see also *Commonwealth v. Lemon*, 804 A.2d 34, 37 (Pa. Super. 2002) (holding that a

14

defendant's concise statement is inadequate where bald statements of insufficiency are advanced without further argument). Defendant has failed to state in his 1925 statement what particular element of the offenses for which there was insufficient evidence. This failure certainly hampers this Court in focusing its 1925(a) opinion.

The standard of review in Pennsylvania of review for sufficiency of the evidence claims is well settled:

"In reviewing the sufficiency of the evidence, we view all the evidence admitted at trial in the light most favorable to the Commonwealth, as verdict winner, to see whether there is sufficient evidence to enable [the factfinder] to find every element of the crime beyond a reasonable doubt. This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Although a conviction must be based on "more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty."

*Commonwealth v. Coon*, 695 A.2d 794, 797 (Pa. Super. 1997) Moreover, when reviewing the sufficiency of the evidence, an Appellate Court may not substitute its judgment for that of the fact finder; if the record contains support for the convictions they may not be disturbed. *Commonwealth v. Marks*, 704 A.2d 1095, 1098 (Pa. Super. 1997) (citing *Commonwealth v. Mudrick*, 507 A.2d 1212, 1213 (Pa., 1986)). An appellate court must view the evidence in the light most favorable to the Commonwealth as verdict winner and must draw all reasonable inferences favorable to the Commonwealth in order to determine if the fact-finder could reasonably have concluded that all of the elements of the crime were established

15

beyond a reasonable doubt. *Commonwealth v. Mitchell*, 839 A.2d 202, 205 (Pa. 2003). Circumstantial evidence alone can be sufficient to convict a person of a crime. *Commonwealth v. Watkins*, 843 A.2d 1203, 1211 (Pa. 2003). In evaluating the sufficiency of the evidence where a conviction is based on circumstantial evidence, the circumstantial evidence must be considered in light of all the inferences and conclusions that reasonably and logically can be drawn therefrom. *Commonwealth v. Rivers*, 644 A.2d 710, 714 (Pa. 1994). The fact-finder is free to accept all, part, or none of the witnesses' testimony. *Watkins*, supra. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. *Commonwealth v. Santana*, 333 A.2d 876 (Pa. 1975.) Under this standard, the evidence was more than sufficient to sustain Defendant's convictions.

Under the Crimes Code, "[a] person commits an attempt when with intent to commit a specific crime, he does any act which constitutes a substantial step towards the commission of the crime." 18 Pa.C.S.A. Section 901(a). "The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done before the actual commission of the crime." *Commonwealth v. Gilliam*, 273

16

Pa Super. 586, 417 A.2d 1203, 1205 (1980).

A person commits attempted murder when he takes a substantial step toward the commission of a killing, with the specific intent to commit such an act. 18 Pa. C.S. Sections 901, 2502; *Commonwealth v. Dale*, 836 A.2d 150, 152 (Pa. Super. 2003); *Commonwealth v. Hobson*, 604 A.2d 717, 719 (Pa. Super. 1992). A specific intent to kill may be established by circumstantial evidence. *Commonwealth v. Keaton*, 729 A.2d 529, 536 (Pa. 1999). "[T]he law permits the fact finder to infer that one intends the natural and probable consequences of his acts [.]" *Commonwealth v. Gease*, 548 Pa. 165, 696 A.2d 130, 133 (1997); *Commonwealth v. Jackson*, 955 A.2d 441,444 (Pa. Super 2008). Thus, "attempted murder is completed by discharging a firearm with the intent to kill, despite the fortuitous circumstance that no injury is suffered." *Commonwealth v. Mapp*, 335 A.2d 779, 781 (Pa. Super. 1975).

In this case there is overwhelming evidence supporting Defendant's conviction for Attempted Murder. The testimony of the Commonwealth witnesses detailed above, which apparently was credited by the jury, establishes every element of the crime beyond a reasonable doubt. In this case, the Defendant admitted firing the gun into Ms. Giles car. Although he testified the gun discharged accidentally and he had no intention to shoot anyone, the jury was free to accept all,

17

part, or none of the Defendant's testimony. From the verdict, it appears that the jury rejected the Defendant's testimony as non-credible and convicted him on the evidence presented by the Commonwealth witnesses. The evidence establishing that defendant shot into an occupied vehicle is sufficient to prove he acted with the intent to kill and sustains his conviction for attempted murder. See *Commonwealth v. Cross*, 331 A.2d 813, 814-15 (Pa.Super.1974) (ascertaining intent to kill where the defendant discharged a firearm at the victim's car and victim was not injured); *Commonwealth v. Jones*, 629 A.2d 133, 135 (Pa. Super. 1993) (evidence sufficient to sustain conviction of attempted murder where Jones fired gunshot that hit front of victim's car); *Commonwealth v. Jackson*, supra (finding sufficient evidence for attempted murder conviction where a defendant, carrying a gun, raised his arm at a detective). Viewing the evidence presented at trial in the light most favorable to the Commonwealth as verdict winner, and drawing all reasonable inferences therefrom, the evidence was clearly sufficient to sustain Defendant's conviction for Attempted Murder.

Defendant's convictions for Aggravated Assault and Recklessly Endangering were merged for sentencing purposes with his sentence for Attempted Murder. As a result, there is no need to discuss a sufficiency claim in regard to those convictions. Turning to his conviction for Firearms Not To Be Carried Without a License, the

18

-32-

Defendant admitted he owned the gun. He further admitted that when he approached the Giles' vehicle he had his gun in hand and his finger on the trigger. Lastly, Defendant stipulated his license to carry a firearm expired on May 14, 2012. N.T. 7/22/2016 p. 163. Again, the evidence was sufficient to convict him of the crime of Firearms Not To Be Carried Without a License.

Defendant's next assignments of error concern three evidentiary rulings. An evidentiary ruling will not be disturbed on appeal unless it reflects manifest unreasonableness, or partiality, prejudice, bias, or ill will, or is so lacking in support as to be clearly erroneous. *Commonwealth v. Minich*, 4 A.3d 1063, 1068 (Pa. Super. 2010) (internal quotations and citations omitted). This standard is highly deferential. *Commonwealth v. Akbar*, 91 A.3d 227, 235 (Pa. Super. 2014). See also *Commonwealth v. Bango*, 742 A.2d 1070, 1072 (Pa. 1999) ("We will not condemn a trial court's ruling as an abuse of discretion merely because we might have reached a different conclusion had the decision been ours in the first instance.").

Evidence is admissible if it logically or reasonably tends to prove or disprove a material fact in issue or if it is a basis for or supports reasonable inferences or a presumption regarding the existence of a material fact. Pa.R.E. 401-403. In other words, it is relevant and probative and the prejudicial effect of its admission does not outweigh its probative value. *Id.*

19

Defendant first complains the Court wrongfully precluded him from testifying about prior incidents of Ms. Giles' behavior that were older than one year. The Defendant was permitted to go into detail about three incidents he had with Ms. Giles in 2015. He was also permitted to tell the jury there were several more spanning back a few years to the time of their divorce. The jury got the picture. Allowing any additional testimony on the subject was cumulative and lacked probative value. The Court did not commit error by cutting the testimony off at that point.

The Defendant next argues the trial court erred by denying his Motion in Limine to preclude Mr. Bates from testifying to additional facts which were not included in his written statement to the police. Specifically, Defendant objected to Mr. Bates testimony that he saw the Defendant fire his gun into the Giles car. However, the Defendant admitted this himself during his testimony so there can be no prejudice. Additionally, the Defendant was permitted to cross exam Mr. Bates about the fact that his in court testimony was not included in his written statement. See N.T. 7/21/2016 p. 92 -102. This claim has no merit.

Defendant's last evidentiary objection is this Court erred by precluding testimony or reference to Defendant's expired license to carry a firearm. This claim is not supported by the record. Although there was an initial ruling at the beginning

20

of the trial, the Defendant was permitted to cross exam about his expired license to carry a firearm and testified about it himself during his testimony. In fact, his expired license to carry a firearm was admitted as a Defense exhibit and cross marked and admitted as a Commonwealth exhibit. Defendant stipulated his license to carry a firearm expired on May 14, 2012. N.T. 7/22/2016 p. 163. This claim also lacks merit.

If any of the above three rulings were in error, it was harmless error. The harmless error analysis was outlined in *Commonwealth v. Green*, 76 A.3d 575, 583 (Pa.Super. 2013) (quoting *Commonwealth v. Laich*, 777 A.2d 1057, 1062-1063 (Pa. 2001)).

> "It is well established that an error is harmless only if we are convinced beyond a reasonable doubt that there is no reasonable possibility that the error could have contributed to the verdict. The Commonwealth bears the burden of establishing the harmlessness of the error. This burden is satisfied when the Commonwealth is able to show that: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict."

In this case, the proof against Defendant was overwhelming. His evidentiary claims afford him no relief.

Lastly, Defendant alleges the trial court erred by overruling defendant's

21

objection to "flight as consciousness of guilt" jury instruction. Pennsylvania's Supreme Court has held flight evidence admissible as consciousness of guilt so long as "the circumstances justify an inference that the accused actions were motivated as a result of his belief that the officers were aware of his wrongdoing and were seeking him for that purpose." *Commonwealth v. Gooding*, 649 A.2d 722 (Pa.Super. 1994) (citing *Commonwealth v. Jones*, 319 A.2d 142, 149-50 (1974). "Where evidence exists that a defendant committed a crime, knew he was wanted, and fled or concealed himself, such evidence is admissible to establish consciousness of guilt." *Commonwealth v. Johnson*, 576 Pa. 23, 53, 838 A.2d 663, 681 (2003). See also *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294 (2002). Evidence of flight may be established through eyewitness testimony. *Commonwealth v. Hudson*, 955 A.2d 1031, 1036 (Pa.Super. 2008) (citing *Commonwealth v. Coyle*, 415 Pa. 379, 203 A.2d 782, 790 (1964). Moreover, a jury may infer that the defendant was aware of his status from the circumstances surrounding his flight. *Hudson*, at 1036 (citing *Commonwealth v. Rios*, 546 Pa. 271, 684 A.2d 1025 (1996). It is also a well settled rule of law, that when a defendant has reason to know that he may be suspected in connection with a crime, the jury may infer a consciousness of guilt from that person's flight or other evasive conduct. *Commonwealth v. Jones*, 570 A.2d 1338, 1348 (Pa.Super. 1990) (citing

22

*Commonwealth v. Harvey*, 514 Pa. 531, 526 A.2d 330, 334 (1987). The weight to be given the evidence of the defendant's conduct, is properly and adequately addressed to the jury as finders of fact. *Id.* An appellate court, in reviewing the propriety of a jury instruction, examines the instruction as a whole and trial courts have broad discretion in phrasing jury instructions as long as it presents the law to the jury clearly, adequately, and accurately. *Commonwealth v. Garcia*, 847 A.2d 67, 73 (Pa.Super. 2004).

At trial, there was ample evidence to place the Defendant at the scene including his own admission. The Defendant also admitted that after the shooting he left the scene. Mr. Bates testified the Defendant denied the shooting. Mr. Brooks testified the Defendant said; "I just shot that motherfucker." Then the Defendant went back around his truck, got in his truck, and pulled off. N.T. 7/21/2016 p. 125, 126. People were running out of the bar to see what happened. The Defendant had to know the police were on the way and that they would want to speak with him. The flight as consciousness of guilt jury instruction was justified by the evidence.

This Court's charge correctly stated the law, was supported by the evidence, and left the decision as to what weight, if any, to assess such evidence, in the hands of the jury. The charge clearly instructed the jury that the defendant's flight might have been for some other motive or even where he is innocent. When read as a

23

whole, the flight instruction correctly advised the jury that it could consider the evidence of consciousness of guilt, but that it was not required to do so. Lastly, the jury was charged that they could not convict on this flight evidence alone.

For the foregoing reasons Judgment of Sentence should be affirmed on appeal.

BY THE COURT:

MARY ALICE BRENNAN, J.

24

-38-